UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT L. SHARP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:04CV1217 JCH |
| | ) | |
| DR. LANCE LURIA, | ) | |
| DR. MANUEL LARGAESPADA, and | ) | |
| SANDRA BURKEL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants Dr. Lance Luria, Dr. Manuel Largaespada and Sandra Burkel's (collectively "Defendants") Motion for Summary Judgment, filed October 11, 2005. (Doc. No. 40). In this action Plaintiff Robert Sharp alleges deliberate indifference to a serious medical need, in violation of the Eighth Amendment. The matter is fully briefed and ready for disposition. For the reasons stated below, the Court grants Defendants' motion.

**BACKGROUND**

By way of background, at all times relevant to this Complaint, Plaintiff Robert Sharp was incarcerated within the Missouri Department of Corrections. Before October 27, 1998, Sharp was confined at the Potosi Correctional Center. After that date, he was moved to Missouri Eastern Correctional Center ("MECC"). Also, at all times relevant to this Complaint, Dr. Largaespada was the Medical Director at MECC, Dr. Luria was Regional Medical Director for Correctional Medical Services, and Burkel was Health Services Administrator at MECC.

Sharp has suffered from ailments related to his sinuses and ears for decades. (Amended Complaint, Doc. No. 16 ¶ 6). Sharp first saw Dr. Largaespada with a complaint related to his ear and sinus problems in March 1999. (Motion for Summary Judgment, Doc. No. 40, attached exh. A, at 17 ("Medical Records")).[1] His next ear or sinus related visit was on June 3, 1999. On both visits he complained of a cold and was given medication for it. (Id. at 19). Sharp's cold continued for over a month. Over several visits, Dr. Largaespada prescribed different cold medications and antibiotics. On July 21, 1999, Dr. Largaespada ordered chest x-rays and a complete blood count, and continued Sharp on his medications. (Id. at 21). On August 12, 1999, Dr. Largaespada told Sharp that his x-ray showed extensive sinusitis, and directed him to continue to take the prescribed antibiotics, antihistamine, and cold medications. (Id. at 22-23). Dr. Largaespada continued to monitor Sharp's condition with several more appointments, and continued him on the same medications. (Id. at 23-24). On October 13, 1999, Sharp told Dr. Largaespada that he had a history of bilateral mastoid[2] surgical intervention. (Id. at 24). Dr. Largaespada prescribed additional medications for the diagnosis of sinusitis and mastoiditis. (Id. at 24).

Dr. Largaespada followed up with Sharp in November, December, and January to evaluate his progress. (Id. at 24-28). In February, 2000, Sharp reported continued symptoms, and Dr. Largaespada warned him not to overuse Afrin, the prescribed nasal spray. (Id. at 28). From March through December, 2000, Dr. Largaespada saw Sharp six times, added different medications and ordered a culture & sensitivity test, sinus x-rays, and a CT scan. (Id. at 24-37). The CT scan showed

---

[1] The following facts are taken from Defendants' statement of undisputed material facts and attached medical records, taking into account Sharp's disagreements with Defendants' statement of undisputed material facts.

[2] This is surgery on the bone that sits behind the ear. Glossary, Nat'l Inst. on Deafness and Other Comm. Disorders, Nat'l Inst. of Health, available at http://www.nidcd.nih.gov/health/glossary/ (last visited February 16, 2006).

left frontal sinusitis, ethormoid sinusitis, and cysts on left and right maxillary. (Id. at 38). Dr. Largaespada consulted with Dr. Luria and requested an Ear Nose and Throat specialist ("ENT") consultation. (Id. at 39). Dr. Luria's response was to continue the medication therapy, and he denied the referral request. Dr. Luria stated that "[r]etention cysts are common and might not be causing any problems. Chronic sinusitis should be treated with appropriate ATB, decongestants, and possibly steroidal nasal spray or even a tapering dose of steroids if allergies are involved. Have all these modalities been employed? Does he have continuous sinus headaches or intermittently? Were his ostiomeatal complexes patent? Let me know what the patient's status is and the answer to the above questions." (Id.) Dr. Largaespada also consulted with another doctor at another facility about the results of the CT scan. He continued to see Sharp from January through March of 2001, during which time he explained the results of the CT scan and continued the medication therapy. (Id. at 38-42). On March 5, 2001, Sharp reported to Dr. Largaespada that his condition had improved with use of the prescribed Beconase inhaler, and wished to discontinue one medication. (Id. at 42). Later that month, Sharp requested to Dr. Largaespada that he be put back on Afrin. (Id. at 44). Over the next three months, Sharp saw Dr. Largaespada for unrelated complaints and did not mention any sinus or ear problems. (Id. at 44-48).

On June 14, 2001, Sharp reported to Dr. Largaespada that Afrin now worked better than Beconase for his sinus problems, and requested an ENT referral. (Id. at 48). Dr. Largaespada put in a request to Dr. Luria that Sharp be prescribed Levoquin and be referred to an ENT. Dr. Luria approved the Levoquin but denied the ENT referral, stating that "an ENT consult may be premature until all the usual treatments have failed and the patient's morbidity rises to the level that intervention is required to function adequately. At least the Beconase worked and the ostiomeatal passages were open. He may require prolonged penicillin meds." (Id. at 49). On July 26, 2001, Dr. Largaespada

began Sharp on Levoquin. (Id. at 51). Throughout the summer and fall of 2001, Dr. Largaespada saw Sharp on several occasions during which he adjusted his medications, and Sharp reported that Levoquin was not helping. (Id. at 51-54). Sharp also reported that he only got relief from his symptoms from overuse of Afrin nasal spray. Dr. Largaespada put Sharp on medication watch for Afrin. (Id. at 54).

On December 12, 2001, Dr. Largaespada again requested an ENT consultation. Dr. Luria denied the request, asking "Is this[3] a continuous problem or intermittent? Is it allergy mediated? How bad are the sinusitis episodes? Have the ATB worked acutely? If they have has he been tried on prolonged ATB course over 3-6 weeks?" (Id. at 55). On February 7, 2002, Dr. Luria denied another of Dr. Largaespada's requests for an ENT consultation. He stated that "[p]rior to considering referral see how patient responds to trial of steroid nasal spray assuming he has received protracted ATB dosaging in the past for sinusitis. I agree that Afrin long term is definitely not indicated since it causes a rebound phenomenon." (Id. at 56). Also on February 7, Dr. Largaespada continued Sharp on medication watch for his Afrin. (Id.). On February 21, 2002 Sharp agreed to try Beconase once again, even though he believed that it did not help. (Id. at 57). On February 26, 2002, Sharp agreed to try self-administered nasal irrigations, and was continued on both Afrin and Beconase. (Id. at 58).

On April 1, 2002, a nurse noted that one of Sharp's ears appeared perforated, and there was fluid in the other ear. (Id. at 59). Dr. Luria approved Dr. Largaespada's request to prescribe Levoquin but denied the request for an ENT consultation. (Id. at 60). April 29, 2002, Dr. Largaespada noted that the Levoquin did not appear to be helping, and again requested an ENT consultation. Dr. Luria denied it, asking "has patient been placed on either high dose amoxicillin or even augmentin to cover anerobes? Has he had a trial of oral steroid tapering dose for possible

---

[3] It is unclear what is the "this" Dr. Luria refers to.

- 4 -

allergic component? Has he been tried on inhaled steroid as a therapeutic trial? Is there a likely allergic component to this?" (Id. at 62).

On May 13, 2002, Dr. Luria approved Sharp for an ENT consult. (Id. at 64). On June 26, 2002, Sharp saw Dr. Kinney at University of Missouri Medical Center. Dr. Kinney recommended that Sharp stay on his current medications, and add Entex LA. He also ordered a CT scan, a hearing test, and a follow up appointment. (Id. at 67). Dr. Kinney also wrote "if he remains symptomatic he may benefit from functional endoscopic sinus surgery." (Memorandum in Support of Motion, Doc. No. 41, attached exh. D at 2). The CT scan showed chronic sinusitis with narrowed ethmoid ostiomeatal areas causing narrowing of these areas, as well as "no great change from the previous CT scan although the maxillary sinusitis of the left shows some improvement. The ethmoid disease is definitely worse especially in the left ostiomeatal area." (Medical Records, at 69). Sharp had his follow up appointment with Dr. Kinney on October 21, 2002. Dr. Kinney recommended and Sharp was approved for surgery of the right canal wall typanomastiodectomy. (Id. at 75). During the time between his first appointment with Dr. Kinney and his surgery, Dr. Largaespada continued to see and treat Sharp. As scheduled, on January 14, 2003 Dr. Kinney performed the surgery. (Memorandum in Support of Motion, Doc. No. 41, attached exh. D at 18-20). There were no complications and Sharp recovered well. Dr. Kinney continued to provide follow up care almost monthly through August, 2002. Medical staff at MECC continued to treat Sharp as well. Pre-surgery hearing tests showed that Sharp had some hearing loss.[4]

Plaintiff filed a number of grievances in connection with this treatment. His main complaint was the repeated denial of his requests for ENT consultations. As stated above, Defendant Burkel

---

[4] There is no evidence before the Court of Sharp's hearing loss, if any, before his treatment by Defendants Drs. Largaespada and Luria. For purposes of this motion for summary judgment the Court shall presume that Sharp's hearing prior to 1999 was not impaired.

- 5 -

was Health Services Administrator at MECC. Sharp filed grievance 01-1317 on December 17, 2001. (Memorandum in Support of Motion, Doc. No. 41, attached exh. E at 3 ("Grievances")). In it he complained of the failure to refer him to an ENT as well as the CT scan procedure. (Id.). On January 3, 2002, Dr. Largaespada responded to the grievance, stating the reasons why the ENT referral was denied by Dr. Luria. (Id. at 5), Sharp appealed the denial, writing that he was in "constant misery 24-7." (Id. at 2). This appeal was denied by W. Laramore. The reason for the denial was that the ENT referral had, by that time, been approved. (Id. at 1). On May 13, 2002, Sharp filed grievance 02-1092.[5] (Id. at 6). He again complained of the failure to get an ENT referral. Burkel responded to the grievance on November 27, 2002. She denied it because Sharp had already received his ENT referral and was scheduled for surgery. (Id. at 9). The appeal was denied for the same reasons. (Id. at 7). Sharp filed grievance 03-519 on September 28, 2003, complaining about the quality of care that he had received and objecting to some of the statements in the previous denials. (Id. at 12, 14). The grievance and Sharp's subsequent appeal were denied by Burkel and J. Sultrop, respectively, because Sharp had received his surgery and the required hearing aid. (Id. at 10, 13).

Plaintiff filed his Amended Complaint under the Civil Rights Act, 42 U.S.C. § 1983, on January 25, 2005 (Doc. No. 16). He asserts that "Defendants' delay in providing medical treatment for Plaintiff resulted in his hearing loss and this act constitutes deliberate indifference to Plaintiff's serious medical needs." (Amended Complaint, Doc. No. 16 ¶ 27). As stated above, Defendants Largaespada, Luria, and Burkel filed the instant Motion for Summary Judgment on October 11, 2005. (Doc. No. 40).

---

[5] This grievance has no grievance number on it, but based on the dates, the Court must presume that it is 02-1092.

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

**DISCUSSION**

In support of their Motion for Summary Judgment, Defendants assert that they did not exhibit deliberate indifference to Sharp's serious medical needs and that Defendant Burkel is not liable under a theory of respondeat superior.[6]

## I.     Defendants Drs. Largaespada and Luria

In their Motion for Summary Judgment, Defendants first maintain Plaintiff's claim must be dismissed, because he fails to establish an Eighth Amendment claim for deliberate indifference to a serious medical need. (Defendants' Memorandum in Support of Motion for Summary Judgment, Doc. No. 41, at 2-6). The Eighth Circuit has held that "[t]he Eighth Amendment requires prison officials to provide humane conditions of confinement, and [o]ne condition of confinement is the medical attention given to a prisoner." Aswegan v. Henry, 49 F.3d 461, 463-64 (8th Cir. 1995) (internal quotations and citations omitted). "[A] prison official violates the Eighth Amendment by being deliberately indifferent *either* to a prisoner's *existing* serious medical needs *or* to conditions posing a substantial risk of serious *future* harm." Id. at 464 (internal quotations and citation omitted) (emphasis in original).

> There is both an objective and subjective component to a claim of deliberate indifference. A plaintiff must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.

Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001) (internal quotations and citation omitted). "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement

---

[6] Defendants also argue that all of Sharp's claims that rely on incidents from before September 1999 are barred by the five year statute of limitations for Section 1983 actions in Missouri. Sharp concedes this point, so the Court will not address it. (Plaintiff's Memorandum, Doc. No. 58, attached exh. 3, at 14).

with treatment decisions does not rise to the level of a constitutional violation." Estate of Rosenberg by Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). Sharp must prove "that the prison doctors knew of, yet disregarded, an excessive risk to his health" Logan v. Clarke, 119 F.3d 647, 649 (8th Cir. 1997) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)) and "that their unconstitutional actions in fact caused his injuries." Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006).

Upon consideration, the Court need not decide whether Sharp's allegations satisfy the objective component of an Eighth Amendment violation, because it is clear from the evidence presented they do not meet the subjective requirements.

As to Defendant Dr. Largaespada, the undisputed material facts and Sharp's medical records show that the doctor gave him frequent medical attention, seeing him nearly monthly over a period of more than four years. Dr. Largaespada listened to Sharp's complaints, and constantly readjusted Sharp's medications in his attempts to alleviate Sharp's condition. More significantly, Dr. Largaespada repeatedly advocated for referral to an ENT, exactly the relief Sharp was requesting. Dr. Largaespada requested at least six times over the course of the treatment that Dr. Luria approve an ENT referral. Sharp points to nothing in the record that shows that Dr. Largaespada was even negligent, let alone displayed deliberate indifference to a serious medical need.

Sharp asserts that Dr. Luria was deliberately indifferent to a serious medical need because he repeatedly denied the requests for an ENT referral. Sharp further asserts that Dr. Luria's choice of questions for Dr. Largaespada display deliberate indifference, in that each time Dr. Luria denied a request, he asked Dr. Largaespada a different set of questions regarding the treatment of Sharp's condition. Sharp contends that Dr. Luria should have asked Dr. Largaespada all of the questions at once, to expedite the referral. The Court does not view Dr. Luria's actions as deliberate indifference. His actions do not rise to the level of a constitutional violation.

Sharp further relies on Mandel v. Doe, 888 F.2d 783, 790 (11th Cir. 1989) to show that a refusal to treat coupled with a refusal to refer amounts to a constitutional violation. The Court finds that Mandel is distinguishable. Mandel, the plaintiff prisoner, fractured his hip. Over a period of three months until his release from prison, the physician's assistant first refused to see him, then refused to order even an x-ray or consult a doctor, and gave him only over the counter pain killers and muscle relaxants. Within a month of the injury, Mandel could not stand or walk on his leg. After prison guards and Mandel's parents attempted to help him get treatment, the physician's assistant alternately put Mandel in an isolation cell with no toilet and ordered him to return to work on the road crew. Due to the delay in treatment, Mandel required a hip replacement, which he could not afford, instead of surgery to repair the injury. The Eleventh Circuit affirmed a jury verdict in favor of Mandel. The physician assistant's actions in Mandel are far more egregious than anything that Sharp alleges. Drs. Largaespada and Luria saw Sharp promptly, provided him with continued treatment for his condition, took several x-rays and CT scans, and eventually referred him to a specialist when Dr. Luria felt that they had exhausted their options. The Court finds it especially probative that Dr. Kinney, the ENT specialist, felt it prudent to continue medical therapy for a few months before recommending surgery. (Memorandum in Support of Motion, Doc. No. 41, attached exh. D at 2).

The Court finds that there is no genuine issue of material fact that Drs. Luria and Largaespada did not show deliberate indifference to Robert Sharp's serious medical needs.

## II. Defendant Sandra Burkel

Sharp's claim against Sandra Burkel is for her liability as a supervisor. (Amended Complaint, Doc. No. 16 ¶¶ 4, 12, 26). He asserts that she should have assisted him in obtaining a referral to an ENT specialist. (Id. ¶ 12). He claims that Burkel had "personal administrative involvement and personal knowledge of [his] serious medical need." (Plaintiff's Memorandum, Doc. No. 58, attached exh. 3, at 12).

As a supervisor, Burkel could be liable under Section 1983 if she "directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996). Here, because the Court found no constitutional violation, Burkel cannot be liable as a supervisor under Section 1983.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Lance Luria, Manuel Largaespada and Sandra Burkel's Motion for Summary Judgment (Doc. No. 40) is **GRANTED**, and Plaintiff's claims against Defendants Luria, Largaespada and Burkel are dismissed with prejudice.

**IT IS FURTHER ORDERED** that all pending motions are denied as moot.

Dated this 22nd day of February, 2006

                                              /s/ Jean C. Hamilton
                                              UNITED STATES DISTRICT JUDGE